PENDLETON and wife *vs.* FAY and others.

Where the power to sell given to executors by the will is special, it can only be exercised in the mode prescribed by the testator.

Where an executor was authorized to sell the real estate at public vendue to pay off the legacies to the children of the testator as they became of age, and he sold the property at private sale to raise money for his own use, before the legacies became payable, the sale was held to be void.

A purchaser, wherever he has sufficient information to put him on inquiry, in equity, is considered as having notice; and in such a case he will not be deemed a bona fide purchaser.

Where an insolvent trustee assigned a mortgage purporting on its face to be given to him as trustee, partly in payment of his own debt to the assignee and, partly for cash which he applied to his own private use, the assignee was held to be chargeable with notice of the misapplication of the trust fund.

If a mortgage while in the hands of the mortgagee is not a valid lien on the property, it will not be valid in the hands of the assignee of such mortgage.

Where a party takes a conveyance of trust property to enable the trustee to raise money thereon for his own private purposes, he is chargeable with the costs of a suit brought by the cestui que trust to set aside such conveyance.

May 4th.    FREDERICK DAVOUE, who died in 1809, by his will made provision for the education of his younger children; and gave to his sons Frederick, Benjamin A. and James B., legacies of $5000 each, and to his son John B. a legacy of $5500, when they became of age respectively; and to his daughters Ann, Mary Egbert, and Harriet, legacies of $5000 each, when they became of age, or were married; all of which legacies were directed by the testator to be paid out of the bulk of his estate. By a subsequent clause of the will the testator directed that the legacies to Mary Egbert, and Harriet should be at all events $5000 each; and if the estate should prove insufficient to pay all the legacies, that a deduction be made from the legacies given to the other children to make up those legacies to the full amount. He likewise directed that so much of his real estate as should be necessary to furnish the sums he had bequeathed to his children, should be sold at public vendue when they should respectively be entitled to the same; and that the rest of his real estate should be leased or rented by the executors to the best

advantage. He further directed that when his youngest child attained the full age of twenty-one years, all his real estate and property not otherwise disposed of should be sold at public vendue, and the proceeds of the sale, together with his personal property, should be divided, share and share alike, between all his children or their lawful heirs. And he appointed his son in law Henry Fanning, his son Benjamin A., and Daniel Allen, of New-York, his executors. Benjamin A. died in the life time of his father, and Allen declined acting as executor. Probate of the will was therefore granted to Fanning as the sole executor thereof. Fanning squandered such portions of the estate as came into his possession, and then became insolvent. In April, 1817, Fanning being desirous of raising money on the property of the testator, made a pretended sale of a lot in the city of New-York belonging to the estate, called the bake house lot, to the defendant Fay, and took from him two bands and mortgages for the purchase money, one for $2000, and the other for $1000. The whole object of this arrangement was to enable Fanning to raise money by selling these bonds and mortgages; and it was agreed between him and Fay that the latter should not be held personally liable for the payment of the bonds. When Fanning failed, in 1812 or 1813, he was indebted to Pott & M'Kinney in about the sum of $1250. In May, 1817, Fanning offered to assign to them the bonds and mortgages taken from Fay, in satisfaction of their debt, if they would discount one third of the amount due to them and advance him the balance of the nominal amount of the bonds and mortgages in money or their own notes. Their debts against Fanning being entirely hopeless, they consented to this arrangement, and took an assignment of the bonds and mortgages. In 1819, Pott & M'Kinney failed, and assigned the bonds and mortgages to Archibald Gracie & Sons, to secure a large debt due to them. Gracie & Sons filed a bill against Fay and obtained a decree of foreclosure against him. Under this decree the lot was sold and bid in by A. Gracie for the nominal sum of $1000. Gracie afterwards gave the property to his son Robert, and conveyed the same to him, with an understanding that if a certain debt due to him from his father should not be paid

from other sources, this property should be applied in payment of that debt. In 1823, the bill in this cause was filed by Harriet Davoue, then an infant. She afterwards intermarried with J. B. Pendleton, and the suit was continued by a bill of revivor.

*C. F. Grim*, for the complainants.

*R. Sedgwick & J. A. Dunlap*, for the defendants.

THE CHANCELLOR. The other children of F. Davoue, and particularly Mrs. Beardsley, have an interest in this question; and if the objection had not been expressly waived by the defendant's counsel on the argument, the cause must have stood over until a supplemental bill was filed, making them defendants. If the legal estate is in the heirs at law of Davoue, the court cannot direct a sale, which will give a good title to a purchaser, unless all the heirs and legatees are before the court. And neither, until the heirs and legatees are before the court, can an account of the rents and profits be taken and a distribution thereof made. But as a decision of the questions of right in this case may enable the parties and legatees to settle the matters in difference between themselves, I shall proceed to dispose of the cause so far as it can be decided between the present parties.

The power to sell, given by the will to the executors, was special, and could only be exercised in the mode prescribed by the testator. It authorizes them, as the legatees become of age, to sell so much of the estate as is necessary to pay their legacies respectively ; and it directs the sale to be at public auction. Neither of these requisites appear to have been complied with in this case. This was not a sale at public auction ; and the legatees, for whose benefit the executor pretended he was selling, were not of age. Independent of the question of fraud, this sale was wholly unauthorized and void, and nothing passed by the conveyance to Fay. But if the executor had the power to sell, this conveyance was a fraud upon the legatees, and may be avoided by them. It is abundantly proved by the evidence in the cause, as well as by the answer of Fay, that the lot never was in fact sold to him. It was a mere device of Fanning to obtain the bonds and mort

gages to enable him to commit a fraud upon some one. Although the bonds and mortgages were given in April, 1817, the deed was probably ante-dated, so as to appear to have been given in the month of September, 1816, to enable Fanning the more effectually to deceive the assignee of the securities, and to consummate the intended fraud. The only question which could have arisen on this part of the case, if the sale had been at auction and after the legatees became of age, would have been, whether the loss should fall upon the assignees of Fanning, or upon the legatees. The mortgages in the hands of Fanning were void, and never could have been enforced against the interest of the legatees in the estate. They were assigned to Pott and M'Kinney, partly for cash and partly in payment of a debt due from Fanning, who was at the time notoriously insolvent. The assignment on its face showed that he was acting as executor. This was sufficient to put them on inquiry, and they ought not to have taken the assignment and paid the money, until they had ascertained that he was not committing a fraud upon the estate. It is not necessary to examine the numerous cases as to the question how far the purchaser from a trustee is bound to see to the application of the purchase money, where it has been paid in good faith to the trustee. That question is now put at rest by the revised statutes. But the question in this case is not reached by the statute; and is one as to which there never was any doubt. If a trustee applies the trust property to pay his own private debt to the purchaser, the latter is bound to ascertain that the trustee is not thereby misapplying the fund and violating his duty ; especially when the trustee is insolvent. Wherever the purchaser has sufficient to put him on inquiry, he is in equity considered as having notice ; and in such a case will not be deemed a bona fide purchaser. In this case the assignment was from Fanning as executor ; and part of the consideration was the payment of his private debt to the assignees, who at the time knew he was insolvent. They undoubtedly supposed he could give them a valid title to the mortgages, or they would not have advanced the balance in money. But there was sufficient on the face of the transaction to create a strong suspicion that some other person

must suffer a loss, at least to the extent of the debt which was paid by the assignment. If the assignees had made the proper inquiries they would have ascertained that the whole was a fraud upon the legatees. The assignment from Pott and M'Kinney to Gracia & Co. was of the same character, except that the latter took the assignment in payment of an antecedent debt. The foreclosure of the mortgages and the purchase of the property by one of these assignees, only divested Fay's equity of redemption, if he ever had any, but did not alter the rights of the parties as against the legatees of Davoue. The gift of the property to R. Gracie, or its assignment to him to secure a debt then due to him, could not make him a bona fide purchaser for a valuable consideration as against the rights of the legatees. Besides these bonds and mortgages were mere choses in action, the assignment of which could not give to the assignees any greater equity against the estate than Fanning himself had. On the whole I am satisfied that no estate passed to Fay which could be legally transferred to any one; and that the mortgages in the hands of Fanning were mere nulities, so far as the estate of Devoue was concerned. And that if any estate did pass to Fay by the deed, the defendants are not entitled to protection as bona fide purchasers, The conveyance to Fay, and the mortgages from him to Fanning, must therefore be declared void, and must be delivered up and cancelled. The complainants are entitled to have the property sold, and the legacies to Mrs. Pendleton and Mrs. Beardsley must be first paid out of the proceeds. They will also be entitled to an account of the rents and profits of the bake house lot from Robert Gracie, since the same came into his possession. But I cannot direct either a sale or an account until other parties are before the court. I can only at present decree the conveyance to Fay, and the mortgages given by him, to be void; and direct a release to be given by R. Gracie, and that the possession of the premises be delivered up to the heirs of Devoue. If the parties cannot compromise without further litigation, all further directions must be reserved, with liberty to the complainants to bring the other parties interested in the estate before the court by supplemental bill. So

far as relates to the costs which have already accrued, the complainants are not entitled to any against the defendants, except as to Fay. He having permitted himself to be used by Fanning for an improper purpose, must pay the costs to which the complainants have been subjected in consequence thereof.