Sacia v. Berthoud.

---

## Sacia and others *vs.* Berthoud.

Where an individual receives from an executor assets belonging to the estate of the testator, knowing that such disposition of them is a violation of the executor's duty, he is to be adjudged as conniving with the executor to work a *devastavit*, and is accountable to the widow and legatees for the property thus received.

Thus where an executor who was in embarrassed circumstances, but owning

Sacia *v.* Berthoud.

a lot upon which he wished to erect a dwelling house, applied to the defendant to advance him money for that purpose, upon a good and collectable bond and mortgage belonging to the estate of his testator, and the defendant, after deducting a large sum from the mortgage debt, by way of bonus, and requiring a personal guaranty of payment, advanced the money to the executor, and took an assignment of the securities, with full knowledge of the use to which the money was to be applied by the executor, but without making any inquiry as to the situation of the estate, or the pecuniary circumstances of the executor; *Held* that the defendant was bound to refund to the persons interested in the personal estate of the testator the amount of the bond and mortgage, with interest.

THIS action was tried at Montgomery circuit in June 1853. It appeared that David H. Sacia, late of Canajoharie in the county of Montgomery, died on the 15th of April, 1842, having previously and on the 25th day of August, 1841, made and published his last will and testament, and leaving the plaintiffs, his widow and children, his principal legatees. The will was admitted to probate, and letters testamentary granted thereon by the surrogate of Montgomery county and issued to Charles Sacia and Josias Sacia, the executors therein named, (his two sons by a former marriage,) the widow who was named as executrix in the will having renounced, and never having acted as such. The value of the property devised by the testator was not far from $5000, a large part of which was contained in a bond and mortgage given by one M. L. Harris and wife to the testator, to secure the payment of the sum of $3,750 with interest annually, in nine years from the first of January, 1842. This mortgage covered certain real estate in the village of Canajoharie, on which was a tavern, and which was of the value of $4,500 and upwards. There was due upon it on the 21st day of April, 1845, the sum of $1957,17, and the mortgagor had always been solvent and able to pay the debt. Josias Sacia was the acting executor until his death in December, 1845, and had this bond and mortgage in his possession until he negotiated it as hereafter stated. It was averred in the complaint and not denied in the answer, that on the first day of April, 1845, when he assigned the bond and mortgage to the defendant, he was in embarrassed circumstances—but the further averment that the

defendant had notice of such embarrassment was expressly denied. It further appeared in evidence that Josias, at the time of the assignment, was in possession of a lot in Canajoharie, and was anxious to erect a building upon it, and that he applied to the defendant to advance him money on this bond and mortgage for the purpose of enabling him to erect his building—that he informed the defendant for what purpose he wanted the money, and told him he desired to have it by the first of April to put up his building with. The defendant told Charles at one interview that he had been negotiating with his brother Josias for a bond and mortgage of Mr. Harris's belonging to the estate of his father. The defendant said Josias wanted the money to erect his building, and he did not know but he would cash the mortgage if his brother would make it a sufficient object to him. There were several interviews between the parties, and the business was finally consummated at the house of Josias, by an assignment of the bond and mortgage by both executors to the defendant; Josias deducting $262,27 from the amount due on the mortgage as a bonus to the defendant. Charles joined in the assignment at the defendant's request, but he testified that he received no part of the money, and that Josias received it all, the sum paid being $1696,94. Josias put up a building on the lot that season with the money thus received, which cost about $2500, and died insolvent on the 3d of December, 1845. It was also alleged in the complaint and not denied in the answer, that he received the money and never accounted for it to the estate. The evidence further showed that there was no debt pressing the estate at the time of the assignment, and its condition did not require a sale of the bond and mortgage. The defendant foreclosed the mortgage and received the full amount remaining unpaid upon it with interest and costs. The complaint charged fraud and connivance on the part of the defendant, to get possession of the bond and mortgage, and that the defendant had notice that the executor intended to apply the proceeds to his own use; and that these acts of the defendant were in violation of chapter 4, part 2, title 3 of the first part of the revised statutes, and of the acts amendatory of the same.

The defendant denied that he had any notice that Josias intended to make any misapplication of the proceeds of the bond and mortgage.

*Hill, Cagger & Porter*, for the plaintiffs.

*H. Adams* and *Platt Potter*, for the defendant.

C. L. ALLEN, J. If this case is not distinguishable from that of *Colt* v. *Lasnier*, (9 *Cow.* 320,) there can be no doubt that the plaintiff will be entitled to recover. That case, if I mistake not, establishes the following propositions, and it is to be held decisive as to the law in this state upon them, viz: That any person receiving from an executor, the assets of his testator, knowing that such disposition of them is a violation of the executor's duty, is to be adjudged conniving with the executor to work a *devastavit*, and is accountable to the person injured by such disposition, for the property thus received, either as purchaser or a pledgee. So if the facts in this case show that the defendant purchased the Harris bond and mortgage knowing that they belonged to the estate of David H. Sacie, and that the executor from whom he purchased intended to appropriate the proceeds to his *own use*, which was in violation of his duty as such executor, I do not see how he is to escape the consequences of such an act.

But it is very ably argued by the counsel for the defendant that this case entirely differs from the one just cited, and that the defendant has not acted wrongfully and has not connived with the executors to work a devastavit, and that he stands fully justified in the purchase of the bond and mortgage, for the reasons, 1. That he purchased and took the assignment from the testator's sons, they being attorneys at law and the executors of his will, and acting and assuming to act as individual owners as well as executors.

In the case of *Hill* v. *Simpson*, (7 *Vesey*, 152,) Joseph Simpson was the nephew of Elizabeth Smith, and was her heir at law and one of the executors of the will. Several legacies were

given by the will. Joseph Simpson alone proved the will and possessed himself of the assets and transferred a portion to the defendants Moffatt & Co. as a security for such sums as he then owed or might afterwards owe them. He afterwards became insolvent. The defendants Moffatt & Co. denied in their answer that they knew or suspected that the funds were not, at the time of the transfer, the absolute property of Simpson as executor or devisee of Elizabeth Smith. On the contrary they believed that they were Simpson's own property, and he represented to them that he was absolutely entitled thereto; that they did not know that any of the legacies were unpaid to the plaintiffs or any other person. That in consequence of and since the transfer, and upon the faith of it, they had paid bills and notes to a large amount. The master of the rolls remarked, "It is true that executors are in equity mere trustees for the performance of the will, yet in many respects and for many purposes, third persons are entitled to consider them absolute owners. A power of disposition is frequently necessary, and a stranger shall not be put to examine whether in the particular instance, that power has been discreetly exercised. But does it follow from this," he inquires, "that dealing with the executor for the assets he may equally look upon him as absolute owner, and wholly overlook his character as trustee when he knows the executor is applying the assets to a purpose wholly foreign to his trust? No decision necessarily leads to such a consequence." He further remarks in the course of his decision, that the defendants *had distinct notice* that the money was not to be applied to any demand upon either estate, *but the assets were to be wholly applied to the private purposes of the executor.* The defendants proceeded upon the faith of the representations of the executor, by which they were induced to believe, that the property he assigned to them was actually his own. They would have seen the falsity of his representation if they had looked at the will. "Common prudence required that they should look at the will, and not take the debtor's word as to his right under it. If they neglect that, and take the chance of his speaking the truth, they must incur the hazard

of his falsehood. It was gross negligence not to look at the will, under which alone a title could be given to them. It was not necessary to shut their eyes against information which without extraordinary neglect they could not avoid receiving."

This case is quoted with approbation in *Colt* v. *Lasnier*, Ch. J. Savage closing his remarks in relation to it by observing that the whole scope of the argument went to prove that the purchaser or banker who receives the property of the testator from the executor knowingly, for purposes inconsistent with his duty as executor, is responsible for such property to the *creditors* or *the persons in interest*. That case, it will be perceived, is like the present in many of its features. There, as here, the purchasers were dealing with the heir at law. There, as here, they alleged that they believed the executor was the owner of the property which he assigned. There, as here, they asserted that they did not know the rights of legatees were concerned, and did not know any thing about the contents of the will; and there as here they might justly infer from the personal guaranty of the executor that he was the only beneficiary in the will; and yet the very fact that the purchaser *knew* that the executor was about to appropriate the proceeds to his own use and for his own benefit, was held sufficient to charge him, on the ground among others, that such knowledge should have induced him as a matter of prudence to go farther, and make proper inquiries as to the contents of the will. It is agreed that the executors were authorized, by law, to sell and assign the bond and mortgage, and that the assignment is valid, and the assignee cannot be called to account to the legatees, without showing fraud and collusion on the part of the assignee, with the executors. The case of *Wheeler* v. *Wheeler*, (9 *Cowen*, 34,) relied upon by the counsel, decides that an executor may pledge or assign a note as collateral security for a judgment obtained against the estate of his testator; and that such an assignment is valid so far as it respects the general power of the executor. Such assignment is not appropriating the funds or assets to his own use. The case of *Sutherland* v. *Brush*, (7 *John. Ch. R.* 17–21,) is also cited by the counsel. The chancellor there says that the general

doctrine seems to be well established both at law and equity, that a bare act of sale of the assets, by the executor, is a sufficient indemnity to the purchaser, if there be no collusion. The defendant denied that when he took the bond and note he knew that they were a part of the estate, and averred that the assignments were taken in good faith, and that he had not then any knowledge of the state of the assets. The chancellor remarked that there was no evidence sufficient to destroy the truth of these averments in the answer, and the bill as to the purchaser was dismissed. That learned jurist cites among other cases in support of his opinion, *Nugent* v. *Gifford*, (1 *Atk.* 463;) *Mead* v. *Lord Orrery*, (3 *Id.* 235;) and *Whale* v. *Sir Ch. Booth*, (6 *T. R.* 625.) In the subsequent case of *Field* v. *Schieffelin*, 7 *John. Ch.* 150—he reviews these cases, and remarks that subsequent decisions have in some degree restrained the extent of the doctrine laid down in them by Lord Hardwick and Lord Mansfield, and cites *Bunner* v. *Ridgars*, (1 *Cox*, 166,) and *Scott* v. *Tyler*, (*Dickens*, 712,) where it was held that where an executrix pledged bonds specifically bequeathed, as a security for her own debt contracted after the testator's death, the pawnee must deliver up the bonds for the benefit of the specific legatee. That though the rule, in general, was that the purchaser of the assets had no concern with the application of the price, yet if one concerted with the executor to obtain the effects at a nominal price, or at a fraudulent under value, or in extinguishing the private debt of the executor, or *in any* other manner, contrary to the duty of the office of executor, he would be liable. He also cites with approbation *Hill* v. *Simpson*, and also *McLeod* v. *Drummond*, (17 *Ves.* 152,) which approves of it—and finally comes to this conclusion, "that the purchaser is safe if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was in fact by the very transaction, applying them *to the extinguishment of his own private debt, or to his own private purposes.*" He remarks that "the latter and better doctrine is, that in such a case he buys at his peril." *Wilson* v. *Moore*, (7 *Condensed Eng. Ch.* 83,) also reiterates the same doctrine.

Sacia v. Berthoud.

(*And see* 2 *Paige*, 202; 2 *Rand.* 298; 5 *Id.* 195; 2 *Vernon,* 616; 1 *John. Ch.* 450, 566.)

The distinction is sought to be taken between this case and the cases cited, that the purchase was here made by *an advance of money at the time* of the assignment, and not for any *antecedent debt* of the testator or his executor. It is true, it is remarked in some of the cases, particularly in *Colt* v. *Lasnier*, that as a general rule the purchaser does not become a party to the fraud by buying or receiving the assets as a pledge for money advanced at the time, and as a general rule he is such party by buying or taking them in pledge in satisfaction of an antecedent debt of the executor, *but that there are exceptions to both rules.* One exception noted is that if one concerts with the executor by obtaining the testator's effects at a nominal price, or at a fraudulent under value, or in any *other manner* contrary to the duty of the office of executor, such concert will involve the purchaser, and make him liable for the full value; that *if he knows* that the assets are to be appropriated to purposes inconsistent with the duty of the executor, he is responsible to the persons in interest.

What are the facts in reference to this bond and mortgage? It is not disputed that the mortgagor was entirely solvent and able to pay the amount of the mortgage. It is true, payment of a part of it had not been pressed; and it is said this is evidence that it was a slow security. It was the very investment intended by the testator for the benefit of his infant children. It was not necessary to distribute it for their support or education. The defendant, after he was applied to for the money, postponed his answer and took time to make all proper inquiries; he no doubt informed himself as he was bound to do, of every fact which a man who exercises ordinary care and prudence in the management of his affairs would deem important. He knew this was the property of the estate. He finally answers that he will advance the money if the executor will make it a sufficient object, that is, will submit to such a deduction from the amount due on the mortgage, as his conscience will permit him to demand. He is informed that the executor is anxious to build, and wishes the fund for that purpose. He finds his necessities for the money

Sacia *v.* Berthoud.

will induce him to submit to a large sacrifice, and after ascertaining that his brother is a co-executor with him, and requiring him to join in the assignment, and both to execute a personal guaranty to secure the payment of the mortgage, he requires the deduction of $262,29 from the amount, and advances the balance to the executor, knowing to what use he is about to put it, and knowing that a single inquiry of him, or at the surrogate's office, would obtain for him the information that this was the property of the widow and the infant heirs mentioned in the will. He requires and the executor submits to a deduction of about 14 per cent on this abundantly safe security, without taking the trouble to inform himself whether the rights of third persons are concerned or not, or of the pecuniary circumstances of the executor, who was insolvent at the time of the transfer. It appears to me, that these facts and circumstances should have put him upon his guard, and demanded the exercise of the utmost caution, and " that common prudence required that he should have looked at the will, and that it was *gross negligence not to have done so.*" It is hardly to be presumed that he did not know of the contents of the will, nor the situation of the testator's family— that there was a widow and minor children depending for their education and support upon the little fund belonging to the estate. At all events I think he was bound to know and could have informed himself. In *Pinckard* v. *Wood,* (8 *Grattan,* 140,) the lands belonging to the estate were sold by the administrator to the purchaser at a discount of 18 or 20 per cent. The charge was, as here, that as there was no necessity for a sale, the condition of the estate not requiring it; that Pinckard had actual knowledge at the time of the sale that he was dealing with an administrator for the assets of the estate of his testatrix, and that the administrator was committing a devastavit by such sale. The court laid stress upon the fact, that the bonds being payable to *Newbill as administrator,* was notice to the purchaser that they were assets of the estate. They remark, " that if the administrator sell debts belonging to the estate, at a price below their value, he thereby commits a devastavit, unless he makes it appear that such sale was manifestly required by

the interests of the estate. This he can never do without show-
ing that the proceeds of the sale were applied to the purposes
of the estate." " And the purchaser who acquires such debt at
a profit, if he has reason to believe at the time, *that the debt be-
longs to the estate*, and is disposed of by the executor for his
individual use, thereby concurs in the fraudulent breach of trust
committed by the executor, and therefore incurs a like liability."
In this case, to apply the reasoning and facts in *Pinckard* v.
*Wood*, the purchaser had the best reason to believe that the
bond and mortgage belonged to the estate, when he purchased
them. He knew so; for he required both executors to join in
the assignment. He not only knew that the executor was about
appropriating the funds to his own use (a *"fact which the result
and condition of the estate have abundantly shown,"*) but that
disposing of a debt well secured belonging to the estate at so
large a discount, was not in the usual course of administration,
and would not be tolerated by the court. Under these circum-
stances he should have ascertained, if he did not already know,
as he might easily have done, and probably from the same source
where he derived his knowledge that there were two executors,
that this property belonged to the plaintiffs, and that it was not
necessary to dispose of it for their benefit, or to answer any calls
upon the estate. (*See cases before cited, and Pendleton* v.
*Fay*, 2 *Paige*, 202.) He did indeed require both executors
to guaranty the payment, and perhaps believed that Josias was
solvent. But such was not the case. And his belief is no de-
fense here. He must look to the estate of Josias, or to the sur-
viving executor, for his indemnity. He cannot throw his loss, if
he sustains one, upon the widow and infant heirs, who were not
in a situation at the time to guard their own rights, which have
been thus affected by his improper and careless intermeddling
with their property. The defendant was fully cognizant of the
intended misapplication, and he therefore cannot complain of
the hardship which he alleges will exist, if he is compelled to
pay both branches of this estate the amount of the bond and
mortgage. I cannot distinguish this case in principle from
*Colt* v. *Lasnier*, and on a careful review of all the cases bear-

ing upon it, and of all the facts and cirumstances, I cannot but come to the conclusion that the defendant is liable to refund to these plaintiffs the amount of the bond and mortgage and interest. Nor can I perceive that in ordering a judgment for the plaintiff I shall be laying down or establishing a new proposition, as intimated by the defendants' counsel. I feel that I am simply recognizing and following, as I am bound to do, the principles well established in the cases which I have cited and reviewed, and the spirit of which will also be found in 2 *Verm. R.* 616; 2 *Strange,* 1178; 7 *Condensed Eng. Ch.* 83; 2 *Ves.* 466; 4 *Cowen,* 110; *Dart on Vendors and Purchasers,* 288; *Story's Eq. Juris.* 581, 8, 395; *Hovenden on Frauds,* 39.

There must be judgment for the plaintiff for the amount of the balance due on the bond and mortgage at the time of the transfer, $1957,17 and interest from 1st April, 1845.

Judgment accordingly.

[Montgomery Special Term, June 13, 1853.   *C. L. Allen,* Justice.]