## Case No. 8,505.

### LORD et al. v. DOYLE et al.

[1 Cliff. 453.] [1]

Circuit Court, D. Rhode Island. June Term, 1860.

VENDOR AND PURCHASER—UNRECORDED MORTGAGE—KNOWLEDGE OF EXISTENCE.

1. Actual knowledge of the existence of a prior unrecorded mortgage has the same effect as if the mortgage had been duly recorded.

2. Where a person purchasing real estate gave back to his grantor a mortgage, to secure a part of the consideration money, and subsequently sold a portion of the property to certain third parties, with the agreement that they should assume a certain proportion of the liabilities to which it was subject up to the time of such sale, and among such liabilities was the mortgage to his original grantor: *Held*, that the subsequent purchasers had sufficient knowledge of the prior unrecorded mortgage.

This was a bill in equity, wherein the complainants [Lord, Warren, Evans & Co.] prayed that certain unrecorded mortgage deeds held by them might be decreed, as against the respondents, to be valid and subsisting

liens upon certain real estate therein described, in the same manner and to the same effect as if the deeds had been duly recorded at the time of their execution and delivery. The respondents named in the bill of complaint were Louis J. Doyle, William W. Bishop, Walter W. Updike, Nathaniel Bishop, Charles Jackson, and two corporations, to wit, the Rhode Island Bleach and Cambric Works, and the Coddington Manufacturing Company. Complainants' case was in substance thus stated in the bill of complaint: Louis J. Doyle, on April 15, 1856, purchased certain real estate in Newport, and on the same day with the purchase gave back to his grantor, the Coddington Manufacturing Company, a mortgage to secure a part of the consideration, viz. the sum of $30,903, which mortgage was duly executed and recorded. Doyle then commenced and prosecuted, on the said purchased estate, the business of manufacturing cotton goods, under the name and style of the Rhode Island Manufacturing Company. During the progress of his business he became indebted to the complainants for certain advances, evidenced by certain promissory notes, bills of exchange, drafts, and a balance of account stated, and executed to them two mortgages upon the above-mentioned estate, one dated August 21, 1856, and another upon the day following, to secure these claims. About the 6th of September, 1856, Doyle proposed to Walter Updike and William W. Bishop, two of the other respondents, to form a copartnership for the purpose of carrying on the same business as that in which he was engaged, and they acceded to the proposal, agreeing that they were each to assume one-third of the debts and liabilities he had incurred in the business on and after a given day in that year, which agreement embraced the sums complainants had advanced to Doyle. The articles of copartnership were drawn up between the parties on September the 27th of that year; and Doyle executed to Updike and Bishop deeds of one third each of the before-mentioned estate, and then the company continued to carry on the same business at the same place and under the same partnership name. Both deeds were executed September 27, 1856, and were delivered by the grantees to Doyle to be recorded. The deed to Bishop was properly acknowledged, and was recorded two days after the date, but the one to Updike was not acknowledged till the 2d of October following, and was not then recorded. It was alleged by complainants that, although their mortgages were not recorded, Bishop and Updike, grantees in the deeds above referred to, had actual knowledge of their existence, and that they recognized and acknowledged the same as subsisting liens on the estate. Three other deeds were made by Doyle; on the 21st of October, 1856, he mortgaged the remaining third of the said estate to William W. Bishop to secure $16,207.21; on October 27th, same

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

year, during the absence of Updike from the state, he deeded the same one third part to the Rhode Island Bleach and Cambric Works; and on the 6th of November following he quitclaimed to William W. Bishop all his interest in the whole of the estate. These were all recorded shortly after the date of their execution. Complainants' mortgages were not recorded until December 10, 1856; but it was alleged that the grantees of the two last-mentioned deeds, viz. the corporation respondents and William W. Bishop, had actual knowledge of the complainants' mortgages at the time the three last-mentioned deeds were executed and delivered. The grantees in these deeds were the only real parties who were contesting the priority of complainants' mortgages.

Thomas A. Jenckes, for complainants.
William H. Potter and Charles Hart, for respondents.

CLIFFORD, Circuit Justice. Relief is sought against the respondent corporation and William W. Bishop solely upon the ground that they had actual knowledge of the complainants' mortgages; and that is the principal question in the case. Separate answers are filed by the contesting respondents, and it is very clear that the questions presented in the case of the respondent corporation are altogether different from those presented in the case of the other contesting party. Knowledge, whether actual, implied, or constructive, is explicitly and unqualifiedly denied by both in language as direct and unequivocal as could well be chosen, and in that respect the questions arising under the respective answers are the same; but it should be remembered that the third part claimed by the respondent corporation is the same third part as that embraced in the deed to Walter W. Updike, which was not recorded. Before this suit was brought, the said Walter W. Updike had commenced a suit in equity against Louis J. Doyle, William W. Bishop, Charles Jackson, and the same corporation respondents in the supreme court of the state. The prayer of the bill of complainant in that suit, among other things, was, that the aforesaid deed to the said respondent corporation might be declared void, and that the priority of his title to that third part of the said estate might be established. Respondents were duly served with process, and appeared, answered, and took proofs; and upon final hearing it was ordered, adjudged, and decreed that the corporation respondents and William W. Bishop had actual notice of the before-mentioned deed to Walter W. Updike, and that the deed to the corporation now under consideration was void, and of no effect as to the complainant in that suit. A supplemental bill of complaint was thereupon filed in this court setting up that decree. Parties made respondents therein appeared,

and answers and replications were duly filed, and proofs taken, and final hearing had; and I am of the opinion that the decree is final and conclusive between the parties, and that the immediate and direct effect of the decree is to establish the title to that third part of the estate in the said Walter W. Updike, both as against William W. Bishop and the respondent corporation. The contesting respondents in this case, therefore, have no title whatever to that third part of the said estate. Stopping there, however, it may be questionable whether any decree could be made in favor of the complainants; but they go further, and introduce the deposition of Walter W. Updike, duly taken in this case, and he testifies that he saw the two mortgages of the complainants prior to the 1st of September, 1856, and that he had actual knowledge of the considerations therein expressed. Taken together, the decree of the supreme court of this state, and the uncontradicted testimony of Walter W. Updike, establish the right of the complainants to a decree in their favor in this case, so far as that third part of the estate is concerned. The controversy between William W. Bishop and the complainants as to the other two-thirds parts of the said estate remains to be considered. Answer of this respondent admits that the proposal and acceptance in writing, as exhibited in the record, were made and executed, and that one third of the said estate was, pursuant thereto, on the 27th of September, 1856, conveyed to him by deed of that date, as alleged in the bill of complaint. He also admits that there was a proposition for a copartnership, and that the articles of copartnership were duly executed as alleged; but he absolutely denies that, by any one or all of these instruments, he ever in any manner became liable to the complainants or to any other person for the debts due from his grantor to the complainants, or that he had, at the time he took said deed, any notice or knowledge whatever of the before-mentioned mortgages of the complainants. Admission is also made by him that the same grantor, on the 21st of October, 1856, mortgaged to him another third part of the estate to secure a loan amounting, with interest, to the sum of sixteen thousand two hundred dollars, but he avers that the same was made in good faith and for a valuable consideration, and without any knowledge or notice in any way of the pretended claim of the complainants, or of the alleged mortgages held by them on the said estate. Regarding the aforesaid deed and mortgage as standing substantially upon the same ground, so far as respects the evidence of notice, they will be considered together. Said mortgage deeds to the complainants were executed to secure certain acceptances and advances made by them at the request and for the benefit of the mortgagor; and it appears that the mortgagees agreed with the mortgagor, at the time of the execution of

the mortgages, that they should not be recorded. They made that agreement at the request of the mortgagor, and in consideration thereof the mortgagor procured Walter W. Updike to give the complainants a written guaranty "to hold them harmless of all loss, cost, and expenses which may in any way accrue to them, their heirs, and assigns, by reason of their not recording said deeds of mortgage." Reference is made to the guaranty, as showing that the omission to record the mortgages in this case was not an oversight, or the result of accident, forgetfulness, or inadvertence, but that the respective transactions were intended to be kept secret, as is evident from the very terms of the written guaranty. Respondents contend that such an agreement is a fraud upon the registry law, and that the complainants, having accepted a written guaranty against loss for keeping the mortgages secret, are bound to look to their guarantor for redress, and that they cannot invoke the aid of a court of equity in their behalf in any matter pertaining to that agreement. Courts of equity might well refuse to enforce such an agreement, or to afford a party thereto any relief, who alleged that it had been broken; but it can hardly be admitted that proof that a complainant has entered into such an agreement in respect to an unrecorded deed, is a good defence on the part of the respondent, who has taken a subsequent deed of the same premises, with actual knowledge that the premises had been previously conveyed to another in good faith. Parties making such an agreement, it may well be held, are entitled to no favor as against a subsequent purchaser for a valuable consideration; but it would be an encouragement to fraud to hold that the wrongful act of one party to a suit is a justification for another wrongful act on the part of the other party, of equal magnitude and immorality. Frauds are forbidden in equity, and when committed they cannot be set off one against another, but each separate transaction must stand or fall by itself. Actual notice is alleged in this case, and the party alleging it must prove it to the reasonable satisfaction of the court. Such a notice of a prior unrecorded deed, in order to be available to the party setting it up, must be so clearly proved as to make it fraudulent in the second purchaser to take and register a conveyance in prejudice to the known title of another: and in weighing the evidence upon that subject, the circumstance that an agreement to keep the mortgages secret was made must necessarily be taken into the account, as diminishing the probability of the theory that the transaction became public. McMechan v. Griffing, 3 Pick. 149; Jackson v. Sharp, 9 Johns. 163; Rogers v. Jones, 8 N. H. 264; Harris v. Arnold, 1 R. I. 125; Landes v. Brant, 10 How. [51 U. S.] 348; Marshall v. Baltimore & O. R. Co., 16 How. [57 U. S.] 314; Foot v. Emerson, 10 Vt. 344; Pendleton v. Fay, 2 Paige, 202;

Gray v. Hook, 4 Comst. [4 N. Y.] 449; Porter v. Cole, 4 Me. 20; Jackson v. Van Valkenburgh, 8 Cow. 260.

The evidence chiefly relied upon by the complainants to prove notice consists of the testimony of Louis J. Doyle, one of the respondents in the suit, and the grantor in all these deeds, and of the testimony of Henry C. Whitaker, the agent of the complainants, who procured the guaranty in their favor against loss for not recording the mortgages, and witnessed the signature of the guarantor. They also contend that a memorandum or short description of the advances and mortgages in question was entered by Louis J. Doyle in a "blotter" kept by him at the mill of the company at Newport, and that the respondents William W. Bishop and Charles Jackson saw the book and read the entry the last of September, 1856, during a visit they made there about that time. Referring to the witness Louis J. Doyle, it will be recollected that he is the grantor in the mortgages in question, and that he is the party for whose benefit the agreement was made to keep the transaction secret, and who furnished the guaranty to save the grantees harmless for not recording their deeds. He it is, also, who sold and conveyed one third part of the said estate to William W. Bishop for its value, and afterwards mortgaged another third part to the same person for a loan amounting to sixteen thousand two hundred dollars, and he it is, also, who conveyed the other third part twice, and now, when examined as a witness, undertakes to testify that all these parties had actual knowledge of the prior unrecorded mortgages to the complainants, although the latter, at his request and for his benefit, had agreed not to put them on record, and he had furnished them with a satisfactory guaranty to save them harmless against loss or expense in consequence of complying with his request. Besides, he made no such communication on the 6th of September, 1856, in the proposal for sale, and nothing of the kind was acknowledged or recognized in the written acceptance executed at the same time. His testimony upon the subject is quite cautious, and far from being satisfactory. Inquiry was made of him whether he had any conversation with William W. Bishop before he made the before-mentioned conveyance to the respondent corporation, and his answer is, that, as near as he could recollect, he did have a conversation with him on the 20th of October, 1856, concerning the contract between himself and the complainants, and the advances made by them and the mortgages given by him to them. To what mortgage or mortgages he refers he does not state, nor is it possible to ascertain from his testimony how near to the actual fact "as near as he can recollect" is; but it does appear that the time when the conversation took place, if at all, is a matter of very great importance, as on the 21st of October, 1856, the witness

mortgaged the only remaining third part of the said estate he then owned to William W. Bishop, to secure a bona fide loan amounting to sixteen thousand two hundred dollars. The deed of mortgage to Bishop was executed on that day, and was duly recorded on the 29th of the same month. Notice should also be taken of the fact in this connection, that, on the 27th of the same October, he conveyed another third part of the said estate to the before-mentioned corporation, well knowing that the same belonged to Walter W. Updike, to whom he himself had previously conveyed it. The witness admits that William W. Bishop inquired of him on that day who, if any one, had claims on the estate, and that he told him that there were no claims, except that of Walter W. Updike, arising out of his unrecorded deed, and the outstanding recorded mortgage of his own grantor, but he reiterates that he had previously, on the 20th of October, 1856, told him particularly of the mortgages of the complainants. Whitaker is also examined, and he testifies that he was present on the last-mentioned occasion, and that he heard the other witness tell William W. Bishop all the particulars in relation to the mortgages and other securities, and the disposal of the goods to be manufactured at the mill. Advances had been made by the complainants to the witness Louis J. Doyle, of about sixteen thousand dollars, and something more than ten thousand dollars remained unpaid when they took the two unrecorded mortgages. The arrangement between them and the witness was, that he, the witness, should make them his consignees of his manufactured goods, and that he was to give them the two mortgages in question, which were not to be recorded, and another of a different estate situate in North Providence, which was to be recorded. They therefore held under the same grantor a recorded mortgage, as well as the two which were unrecorded, and all three had respect to the same subject-matter. The recorded mortgage was specified in the proposal of sale, and it is there stated that the grantor therein obtained an advance of ten thousand dollars, for the security of which he gave a mortgage on his estate situate in North Providence, and that he put the capital into the concern; but he made no mention of the unrecorded mortgages, or of any other lien on the said estate, except the outstanding mortgage of his own grantor. Statement of the first witness is, that, just after his first conveyance to William W. Bishop, he, the grantee and Charles Jackson came to the mill and counting-room and examined the mills and books, and that the latter took the daybook, that is, the "blotter," in his hands and commenced at the beginning and read the entries aloud to the other party, and made comments on them in his usual style. Theory of complainants is, that this meeting was on the 27th of October, 1856, which is the date of the deed to the

before-mentioned corporation respondent. Assuming that to be true, it would then appear that the respondent then ascertained, unless he knew before, that the two-third parts of the estate conveyed to him, one-third part by an absolute conveyance and for its full value, and the other by a mortgage deed to secure a loan of sixteen thousand two hundred dollars, were subject to two unrecorded mortgages to the complainants; and that, instead of complaining of the attempt to defraud him, he proceeded to purchase, in the name of the company he represented, another third part of the same estate, well knowing that the title would be subject to those mortgages unless he and the other two persons present should all refuse to speak the truth. Such a theory is improbable, if not incredible, and must be fully proved before it can be adopted. Respondents examined Oliver P. Davis, who was the clerk of the before-mentioned respondent corporation, and he testified that Charles Jackson, on the 27th of October, 1856, asked Louis J. Doyle if there were any claims or encumbrances on the property he was about to sell, and that his reply was, that there were none whatever known to him, except the outstanding mortgage of his grantor. Twice he was interrogated upon that subject, and twice he answered in the same way, and without any qualification. They also examined Pardon Olney, who was the superintendent of the mill at Newport, and he testified that Louis J. Doyle came there on the 19th of November, 1856, and asked him, the witness, to let him have the keys of the safe where the books were kept, and the witness let him have the key, and he, the said Louis J. Doyle, took the book out of the safe and did some writing in it, but the witness does not know what it was. Argument for respondents is, that the memorandum now appearing in that book respecting the unrecorded mortgage or mortgages of the complainants was made at that time, and they exhibit the book and insist that its appearance establishes the theory that it was not made at the same time as the writing which stands in the same connection. The deposition of William W. Bishop is also introduced by respondents, that the first he heard of such mortgages was after the 1st and before the 6th of November, 1856, and he admits that he and Charles Jackson went to Newport in October, 1856, as alleged, and that they visited the mill and saw the blotter. Entries were then on the book, as he states, describing the four acceptances of twenty-five hundred dollars each, and also describing the four notes given in exchange for the same; but he states that he is positive there was then no entry on that book such as now appears respecting the unrecorded mortgages of the complainants. Asseverations equally explicit and unqualified are also made by Charles Jackson, whose deposition also was taken

by the respondents. He says he is positive that Louis J. Doyle represented that there was no encumbrance on the property, except the mortgage to his own grantor, and he is fully confident that the disputed entry on the blotter was not there when he and the witness examined it. Pressed by the weight of this testimony, the complainants re-examine Louis J. Doyle, and he testifies that he does not recollect that he got the key of the safe as stated, but says he always had the keys. His account of the matter is, that some one handed him a note that he was discharged, and that he went to the room where the safe was, and made the last two entries on pages thirty-seven and thirty-eight of that same book, and he avers that he thinks William W. Bishop examined the books at the mill more than once. Suffice it to say, that I am of the opinion that the weight of the evidence clearly shows that the entry respecting the unrecorded mortgages was not on the blotter at the time the two witnesses of the respondents examined the book, and I am also of the opinion that the complainants fail to overcome the allegations in the answer of William W. Bishop, wherein he denies that he had knowledge or notice in any way of their unrecorded mortgages, either when his first deed or when his mortgage of the 21st of October, 1856, was made and recorded. On the other hand, I am of the opinion that he had actual knowledge of those unrecorded mortgages before the quitclaim deed to him of the 6th of November, 1856, was executed and delivered. Decree for complainants in conformity to the opinion of the court, and unless the parties agree they will be heard as to the form of the decree.