### DEY and others *vs.* DEY and FOSTER.

1. If a trustee commits a breach of trust in the assignment of a bond and mortgage, and the assignee is a party to the breach of trust; or, if there is any fraud or collusion between them; or, if the assignee knows, or is sufficiently informed when he accepts the bond and mortgage, that the trustee has in contemplation a breach of trust, and intends to misapply the money, the assignee will be decreed to have taken the bond and mortgage in trust for the beneficiaries under the trust.

2. Trustee decreed to account, and removed; assignee decreed to deliver the bond and mortgage to a receiver, and to account for all interest collected by him, thereon.

On final hearing, on pleadings and proofs.

*Mr. C. Borcherling, junior,* and *Mr. James Richards, junior,* (of New York,) for complainants.

*Mr. I. W. Scudder,* for defendant, Foster.

THE CHANCELLOR.

The bill is filed against James R. Dey, as surviving trustee, for an account, and for his removal from his office of trustee, and to compel him and his wife to convey, for the benefit of the trust, certain land in New York, the title whereto is held

by the latter, alleged to have been fraudulently purchased with the trust funds ; and to compel the defendant, Foster, to deliver up, for the benefit of the trust estate, a certain bond and mortgage assigned to him by Dey, as trustee, and to account for the interest received by him thereon. The bond and mortgage in question were given by William H. McClave and Edmund W. McClave to Charles J. Gilbert, were dated October 2d, 1865, and were made to secure the payment of $7000, in two equal installments, one payable in five years, and the other in six years from that date, with interest. They were, as is admitted in James R. Dey's answer, held by Jacob C. Dey and him as trustees, under the trusts contained in a deed from Richard Dey to them, and were assigned to them by Gilbert on the 5th of October, 1865. On the 7th of January, 1868, James R. Dey, who then held them as surviving trustee, assigned them (the whole of the principal being unpaid) to Foster, at a discount of $1000. Foster and Dey each occupied a desk in the same office in New York at that time, and had done so for some years previously, and their business relations had been, and then were, very intimate. The question discussed at the hearing was, whether Foster ought to be decreed to hold the bond and mortgage in trust for the *cestuis que trust* under the deed from Richard Dey. The principles on which the decision of this question depends are well established. If the trustee committed a breach of trust in the assignment of the bond and mortgage, and Foster was a party to the breach of trust ; or, if there was any fraud or collusion between them ; or, if Foster knew, or was sufficiently informed when he accepted the bond and mortgage, that Dey had in contemplation a breach of trust, and intended to misapply the money, Foster must be decreed to have taken the bond and mortgage in trust for the beneficiaries under the trust deed. *Field* v. *Schieffelin*, 7 *Johns. Ch. R.* 150 ; *Nichols* v. *Peak*, 1 *Beas.* 69 ; *Pendleton* v. *Fay*, 2 *Paige* 202. The bill states, on information and belief, that James R. Dey assigned the bond and mortgage to Foster, to secure an indebtedness of Dey to him, of over $15,000, and that Dey was then

insolvent, and known to Foster to be so. The answers of Dey and Foster explicitly deny the alleged insolvency, and that the assignment was made to secure any existing indebtedness ; but allege, on the other hand, that Dey was entirely solvent, and that the bond and mortgage were sold by him to Foster for cash, paid on that account alone by Foster to him.

It appears that Dey was then very largely engaged in the manufacture of fertilizers, which were sold by Foster for him on commission, the latter making advances on the goods. It also appears that, in July, 1868, (the bond and mortgage were assigned to Foster on the 7th of January, 1868, though purchased by Foster, as is alleged, on the 14th of December preceding,) they entered into an agreement with each other, by which Foster agreed to make advances to Dey, not to exceed $50,000, on fertilizers, at the rate of $12 per ton of forty bushels ; to be manufactured by the latter, and stored, but not to be sold before the 1st of January following ; after which time Foster was to have the monopoly of the sale thereof, and to apply the proceeds to the re-payment of his advances and his commissions, and of an existing indebtedness of $55,363.17, found due from Dey to him on an accounting between them, and for which he held certain goods and business securities applicable thereto. This arrangement was evidently made to supply Dey with capital in his business. Dey, in his answer, alleges that, at the time of the sale of the bond and mortgage, he was doing a very large and prosperous business, his transactions in which amounted, in 1867, to $800,000, and in each of the years 1868 and 1869, up to the time of his bankruptcy, which took place in the last mentioned year, to $1,500,000, and that he was daily in the receipt of large sums of money, and sometimes kept in bank an unemployed balance of over $20,000. He offers no proof, however, that his affairs were in this flourishing condition. On the other hand, it appears that, at the time when the sale of the bond and mortgage was made, he was in the habit of borrowing of Foster large sums of money for use in his business. Although Foster, in his answer, evasively says that, during

the period in which he sold property for Dey on commission, "there may have been times when the advances to Dey exceeded the property on hand, but in all such cases, if any, the advances were all repaid by the sale of fertilizers ;" and although, in his testimony, he said that he was not able to say that Dey owed him anything on the 14th of December, 1867 (the time of the purchase of the bond and mortgage,) and added, that if Dey did owe him anything, it was for advances on fertilizers ; yet it appears, by evidence produced by him, that at that time Dey owed him $51,045.02, on account of advances, an indebtedness which, in July following, had increased to the sum of $55,363.17 ; and it also appears that, at the time of the purchase of the bond and mortgage, Dey owed him, for borrowed money, $4500, and that that debt had been secured by mortgage on Dey's real estate, in Jersey City, since the preceding month of February. If, at that time, Dey had indeed such abundant resources, it is difficult to conceive of a reason which, to the mind of a business man, would have seemed to warrant him in selling these trust securities at a very large discount, although they were perfectly safe, and no necessity for their sale existed, and that, too, without any consultation or even communication on the subject with those whom he represented. If, on the other hand, he was in need of money, an illegitimate reason for the sale appears. Foster professes to be unable to give a statement of the credits to which Dey was entitled in their mutual business dealings. Though notified to produce his books, he does not do so, and gives no satisfactory reason for his failure to produce them. To the question whether, in December, 1867, he had not either a conveyance of, or a mortgage upon, or a lease of every piece of real estate of which he knew Dey to be the owner, or which he knew Dey to be interested in, he answers that he does not recollect. These things cast discredit on his statement that Dey, at the time of making the assignment, was not indebted to him, except it might have been on account of advances on fertilizers, which were sufficiently secured. Dey committed a *devastavit* of the trust

estate to the extent of the amount of the McClave mortgage. I cannot doubt that he contemplated committing it when he sold the bond and mortgage; nor can I doubt that Foster, with his intimate relations with Dey, knew, or had reason to believe, that the latter proposed to use the money he might receive for these securities for his own purposes. After the assignment of the bond and mortgage, and up to April 2d, 1870, Dey collected the interest, and in one instance a debt of his amounting to $85, due the mortgagors, was deducted by them out of the interest, without remonstrance or remark. The clerk by whom the interest was collected, was Dey's clerk, and he receipted in the name of Dey, as trustee, for the interest. He did not know of the assignment, as appears from Foster's testimony. This evidence shows collusion and fraud. Foster does not plead ignorance of the character of the securities he claims to have purchased. He was in doubt as to whether he could safely purchase the bond and mortgage, because they were held by Dey, as trustee; and he consulted counsel here and also in New York, on the subject. He swears that Dey did not tell him, nor did he know to what use the money paid for the assignment, was to be applied. Surely, common prudence would have dictated an inquiry on that score. According to his own testimony, his inquiry of his counsel was not whether he could *safely* buy the bond and mortgage, but whether he could buy them; that is, whether Dey could make a legal title to him for them. It appears that he made no inquiry as to the value of the mortgaged premises, nor as to the bond and mortgage, but purchased the latter without inquiry, on the representation of Dey that the mortgaged premises were worth more than the mortgage. Though Dey, as Foster claims, was entirely solvent, yet it would appear that the pressing offer by Dey to sell a trust bond and mortgage at over fourteen per cent. discount, excited neither surprise nor inquiry on the part of Foster. Nor is this discount to be accounted for on the ground of the hazardous or doubtful character of the securities; for Foster had no doubt on that score; and there

appears to have been no room for any. I am unable to resist the conclusion that Foster knew that Dey was disposing of the bond and mortgage for his own use. Though Dey alleges that he sold the bond and mortgage in order to put the money where it would produce a better interest, and that he did, in fact, invest it in paying for the building of two dwelling-houses he had erected on a tract of thirteen lots of land, which he owned in Jersey City, yet it is very clear that if he so used the money, it was in payment of his own debts, and that, although he caused Middleton Bell, to whom he had conveyed the property, or caused it to be conveyed, to convey it to him in trust, in December, 1870, it was for the purpose of, in that way, accounting for the trust money which he had fraudulently converted to his own use.

Dey must account, and he will be removed from his office of trustee. Foster will be decreed to deliver up the bond and mortgage to a receiver, and to account for all interest collected by him thereon. The evidence does not sustain the allegation of the bill as to the purchase of the property in the State of New York, with money of the trust estate.